# Exhibit 11

(1) CLAIMANT
(2) A. J. PRESTON
(3) 1ST AFFIDAVIT
(4) EXHIBIT "AJP1"
(5) 24 FEBRUARY 2017

**CLAIM NO:** CL-2017-_____

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

B E T W E E N :-

**LATIN AMERICAN INVESTMENTS LIMITED**

**Claimant**

-AND-

**(1) MAROIL TRADING INC.**
**(2) SEA PIONEER SHIPPING CORPORATION**

**Defendants**

---

**FIRST AFFIDAVIT OF**
**ANDREW JAMES PRESTON**

---

I, **ANDREW JAMES PRESTON**, of The St Botolph Building, 138 Houndsditch, London EC3A 7AR, United Kingdom, **STATE ON OATH**:

1     I am a Solicitor of the Senior Courts of England and Wales and a Partner in the firm of Clyde and Co LLP (**Clyde & Co**) of the above address.

2     I have conduct of this matter on behalf of the Claimant, Latin American Investments Limited (**LAIL**) and have been duly authorised by the same to swear this Affidavit in support of its application for a proprietary injunction, a worldwide freezing injunction and ancillary relief as well as permission to serve out of the jurisdiction against the Defendants: Maroil Trading Inc. (**Maroil**) and Sea Pioneer Shipping Corporation (**Sea Pioneer**). This application is made ex parte without notice.

relation to the PDVSA settlement and with limited other work for him to do, in mid-2016 Mr Mooney ceased acting for the Sargeant family. The last payment made to him pursuant to the retainer was on 1 July 2016. This parting was amicable. Between July and October 2016, Mr Sargeant occasionally contacted Mr Mooney to find out if there was any news in relation to Mr Ruperti but there were no developments.

119 Then, in October 2016 Mr Sargeant was provided with documents which showed that Mr Ruperti had been lying and concealing the truth and that his companies had entered into a settlement with PDVSA at the end of 2014, including in respect of the COA claims. I deal with this discovery in the next section below. As regards Mr Mooney, LAIL is now concerned about whether he may have known more or otherwise than he disclosed to Mr Sargeant. LAIL is also concerned that any information given to or communications with Mr Mooney in relation to the matters I refer to below, or to this application generally, might be passed by him to Mr Ruperti. Accordingly, Mr Mooney has not been contacted in relation to this application.

### A.8 The New Documents

120 On 6 and 28 October 2016, Mr Sargeant, was given documents which show that in December 2014 Maroil, Sea Pioneer and Mr Ruperti entered into settlement agreements with PDVSA, including in relation to the COA claims and the First PDVSA Arbitration and has received from PDVSA over USD200 million pursuant to those settlements (the **New Documents**).

121 I deal with the source of the New Documents provided to Mr Sargeant in a separate section below.

122 The New Documents comprise of the following:

(a) An initial claim made by Sea Pioneer and/or Maroil and/or Mr Ruperti against PDVSA dated 9 August 2012 (the **August 2012 Letter of Claim**)[50].

(b) A settlement agreement dated 22 December 2014 between, amongst others, PDVSA, Sea Pioneer and Maroil (the **Payment Agreement**)[51].

(c) A Commission Agreement dated 10 February 2015 between Commerzbank A.G. and Sea Pioneer (the **Commission Agreement**)[52].

---

[50] [AJP1G/1/985-995] This was provided to Mr Sargeant on 28 October 2016.
[51] [AJP1G/3/1004-1023] This was provided to Mr Sargeant on 6 October 2016.

0502080/003 57954712.1

29

(d) A letter from Canonica Valticos de Preux + Associés to Sparkasse Schwyz bank dated 12 February 2015 (the **Canonica Letter**)[53].

(e) Sparkasse Schwyz bank account entries for February and March 2015 (the **Bank Account Entries**)[54].

(f) Factual summaries, which we assume were prepared by the source that provided the New Documents[55].

*The August 2012 Letter of Claim*

123  The August 2012 Letter of Claim is in Spanish. I have obtained a translation of it, which is at **[AJP1G/2/996-1003]**.

124  The letter depicts various claims that Maroil and/or Sea Pioneer and/or Mr Ruperti make against PDVSA. Those claims are said to relate to six vessels: LEANDER, HERO 1, ALLORO, POLAR, GENERAL ZAMORA and ALMIRANTE BRION. As I mentioned above, all of these vessels were the subject of joint ventures with LAIL and, in respect of LEANDER and HERO 1, with OTS as well, although the joint ventures in relation to GENERAL ZAMORA and ALMIRANTE BRION had ended some time earlier.

125  The August 2012 Letter of Claim is not easy to follow. However, essentially it alleges that PDVSA failed to pay freight (or paid it late) and failed to perform its other obligations in relation to the 6 vessels, and that as a result there was insufficient income to service bank loans and expenses so that the vessels were re-taken by the banks and sold at unfavourable prices. It is then alleged that, as a result, Maroil (as the holding company receiving the profits from all subsidiaries including Sea Pioneer) went from being a profitable company to making no profits. It is then said that as a result, the loss of profits to date was more than USD 350 million.

126  The August 2012 Letter of Claim also claims for the loss of reputation suffered by Mr Ruperti and claims, apparently based on what Maroil used to earn and the number of working years left for Mr Ruperti, a further sum of USD 350 million. The letter however, states that the Claimants would accept USD290 million in respect of

---

[52] [AJP1G/5/1037-1039] This was provided to Mr Sargeant on 28 October 2016.
[53] [AJP1G/6/1040-1042] This was provided to Mr Sargeant on 6 October 2016.
[54] [AJP1G/7/1043-1056] This was provided to Mr Sargeant on 6 October 2016.
[55] [AJP1G/8/1057-1059] These were provided to Mr Sargeant on 6 and 28 October 2016.

0502080/003 57954712.1

set out in the Payment Agreement. Canonica explained to Sparkasse that these transfers related to the Payment Agreement, a copy of which it attached.

*Bank Account Entries*

145  The Bank Account Entries are extracts of Maroil's account with Sparkasse, which show incoming funds from PDVSA matching (almost) the 4 instalments due after the end of January 2015. There is also an entry which notes the credit of USD 10 million from Commerzbank, reference "*commission according to agreement dd 10 February 2015*". I believe that this is the payment from Commerzbank pursuant to the Commission Agreement discussed above. I consider the Bank Account Entries further below when dealing with what is known about the Defendants' assets.

*Conclusion on the New Documents*

146  In light of the above, it appears that Sea Pioneer entered into a settlement with PDVSA in respect of the COA claims and the First PDVSA Arbitration, which had been commenced against PDVSA by the VLCC JV Companies. However, the surplus beyond that which Commerzbank was insisting on in settlement of the Indebtedness was not properly held by Sea Pioneer on trust for the VLCC JV Companies. Instead, Sea Pioneer and/or Maroil, into whose account the monies were paid, have pocketed USD10 million, without informing the joint venture companies or their other shareholders: LAIL and OTS.

147  Further, a settlement was reached between the Defendants and PDVSA based on claims for loss of profits and loss of reputation arising from the PDVSA charters of four vessels, two of which (namely the POLAR and ALLORO) were joint venture vessels throughout the relevant time. However, damages paid by PDVSA in relation to the PDVSA charters of joint venture vessels should be paid to the joint venture owning companies of those vessels (OCL and BPT, respectively), not solely to Maroil companies.

148  There has also been gross deceit by Mr Ruperti and, through him, the Defendants in keeping these settlements secret and indeed directly lying to Mr Sargeant about whether a settlement had been reached. It is my firm belief that had the New Documents not been brought to the attention of LAIL by a third party, LAIL would still be unaware of the settlements which were agreed and the payments which were made almost two years ago.

### A.9 Source of the New Documents

149  As I have noted above, Mr Sargeant was provided with the New Documents on 6 and 28 October 2016. The relevant background is as follows.

150  In December 2014 Mr Mooney had informed Mr Sargeant that he had been approached by a gentleman from private investigators called Focus. From an Internet search conducted by my colleague, I note that the full company name is Focus Intelligence Ltd., and it was acquired by the litigation funding firm Burford Capital Limited (Burford) in 2015. Mr Hall is listed on Burford's website as a director, and the co-head of Focus, and is apparently a UK qualified solicitor who previously worked at Stephenson Harwood. See http://www.burfordcapital.com/

151  Mr Sargeant first met with Mr Daniel Hall of Focus on 13 January 2015. Focus was acting on behalf of a Mr Mohamed Al-Saleh (and his lawyer, Mr Ed Davis of Astigarraga Davis of Miami, Florida), trying to trace assets of Mr Harry Sargeant III (Mr Daniel brother) in satisfaction of an unpaid Floridian judgment. At that time it was known that there was a rift between the Sargeant family and Harry Sargeant III, and Mr Hall was seeking Mr Sargeant's assistance with regard to Harry Sargeant III's assets. Mr Sargeant also learned that Focus was acting on behalf of Novoship in the Novoship Action against Mr Ruperti.

152  In August 2015 Mr Hall indicated to Mr Sargeant that he had some material relating to Mr Ruperti that might be of interest. For his part, Mr Hall wanted some material relating to Mr Harry Sargeant III that Mr Sargeant and Mr Hall had previously discussed. However, Mr Sargeant was not in London at that time and no meeting took place. In early October, Mr Sargeant contacted Mr Hall and suggested a meeting, indicating that he would like to see the material relating to Mr Ruperti that Mr Hall had mentioned. Mr Sargeant met with Mr Hall in London on 6 October at which time he was given the New Documents I have identified at paragraph 122 above.

153  The next day, having reviewed the documents Mr Hall had provided to him, Mr Sargeant contacted Mr Hall and explained that he was particularly looking for copies of any documents between Mr Ruperti and PDVSA mentioning the VLCCs. Mr Hall stated that he did have such documents. At the same time, Mr Hall maintained his request for copies of the personal material relating to Mr Harry Sargeant III. Mr Sargeant made arrangements to provide that material to Mr Hall

which, Mr Sargeant informs me, is of a sensitive personal nature and is entirely unrelated to these proceedings.

154   A further meeting took place in London on 28 October. At the meeting, Mr Sargeant was provided by Mr Hall with the remainder of the New Documents, which I have identified at paragraph 122 above. A few days later, Mr Sargeant contacted Mr Hall to ask him whether it was likely that the Swiss bank accounts identified in the New Documents would still contain any funds. Mr Hall replied that he did not know. Mr Sargeant has had no further contact with Mr Hall since then.

155   As is clear from the above, and I confirm, at no time has LAIL, Mr Sargeant or anyone on their behalf, provided Focus, Mr Hall or Mr Ed Davis any money for the provision of information or documents relating to Mr Ruperti and his companies. Further, the New Documents were not obtained by Focus at the instigation or request of Mr Sargeant. As appears from the above and to the best of Mr Sargeant's information and belief, they were documents which Focus in any event had.

156   We have not asked Mr Hall or anyone from Focus how they came into possession of the documents. Neither Mr Sargeant nor I believe that they would disclose their sources. My guess is that Focus probably got the documents via the Novoship Action. We know from a judgment handed down in the Novoship Action that an extended Worldwide Wide Freezing Order was granted against Mr Ruperti on 14 January 2015 and an application by Mr Ruperti to discharge or vary the Order was heard on 1 April 2015.[56] It is likely that disclosure was required to be given pursuant to the Order and/or for the purposes of the application to discharge or vary the injunction. Given that timing, and the dates of the New Documents, it seems to me likely that these New Documents were disclosed by Mr Ruperti in the Novoship Action and thus came into the possession of Focus.

157   My guess is also consistent with the timing of when the New Documents were given. As noted above, that was in October 2016. It was at that time that Novoship and Mr Ruperti entered into a full and final settlement of all their disputes and outstanding litigation. This was reported in the maritime press in early October 2016, and Mr Sargeant himself found out about it at that time. It may be that with that litigation finally ending, Focus regarded themselves as able to give the documents to Mr Sargeant.

---

[56] Novoship (UK) Ltd and others v Mikhaylyuk and others [2015] EWHC 992 (Comm).

0502080/003 57954712.1

### A.10 Events after Receiving the New Documents

158   Following receipt of the New Documents, Mr Daniel Sargeant consulted me and this of course has led to this application being made. Having instructed Leading Counsel, a decision was made that it was appropriate in all the circumstances to draft full Particulars of Claim before making an application. Given the lengthy history and period of time that has had to be covered in this application, the Christmas period and the fact that Mr Sargeant has had to have surgery in the interim, it has taken some time to have this application ready.

159   Having received the New Documents, Mr Sargeant has also contacted Mr Mooney on a few occasions to ask whether he had heard from Mr Ruperti. Mr Mooney had nothing to report. Mr Sargeant has not told Mr Mooney about the New Documents and what we now know. This is because we cannot be sure about whether Mr Mooney is in fact in Mr Ruperti's 'camp' and whether he could be trusted not to tip Mr Ruperti off. Of course, Mr Mooney could himself have been duped and may in fact be entirely trustworthy in this regard. However, it is not a risk that we can afford to take.

160   Having received the New Documents, Mr Sargeant also reached out to Mr Ruperti to see what response he might get. Of course Mr Sargeant did not refer to his discovery, but merely sent Mr Ruperti a text congratulating him on the Novoship settlement and asking to get together. The reason behind this message, Mr Sargeant informs me, is that by this point he wanted to see whether Mr Ruperti would now mention the PDVSA Settlements given that his excuse for not pursuing it (being his concern that it be caught by settlement of the Novoship Action) had now gone. However, Mr Ruperti did not reply to the text.

### B. GROUNDS FOR INJUNCTIVE RELIEF

### B.1 Introduction

161   I address in turn below:

(a)   The merits of the underlying claim, with a view to showing that there is a serious issue to be tried and that LAIL has a good arguable case. I shall deal with the position in relation to the VLCCs and the Commission Payment first,

263   These are email addresses for the Defendants and Mr Ruperti that my colleagues at Clyde & Co found in papers relating to this matter or to the 2010 High Court Proceedings. The address wilmer.ruperti@interpetrol.com is given as the Defendants' contact address in the Payment Agreement.

264   For the avoidance of doubt, it is not proposed that all documents be sent by email, on grounds of practicality. If all of the documents were sent by email, there might be transmission problems because of their size. Rather, what is proposed is simply to send the Court's order by email, under cover of a message explaining that a freezing injunction has been obtained (if the Court has so ordered), that copies of the affidavit and other documents supporting the application will be served in hard copy and that (except for the exhibits to this affidavit, due to their size) copies of such documents can also be provided by email on request.

**E. CONCLUSION**

265   I believe and LAIL believes that there are strong grounds for making a proprietary and freezing injunction and for granting the other relief sought.

266   I invite the Court to make orders in the form of the drafts accompanying the application notice.

**Statement of truth**

I believe that the facts stated in this Affidavit are true.

SWORN this 24th da of February    7

By:

    Andrew Jam    reston

Before me:

A Solici    missioner  administer Oaths

A Commissioner for Oaths
Bankside House, 107 Leadenhall Street
London EC3A 4AF
England
(Jeremy B. Burgess)

0502080/003 57954712.1