# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 18-cv-80748-BLOOM/Reinhart**

DANIEL HALL, BURFORD CAPITAL, LLC,
and DUNDROD INVESTMENTS, LTD.

      Plaintiffs,

v.

HARRY SARGEANT, III,

      Defendant.

_____/

## ANSWER, DEFENSES, AND COUNTERCLAIM

    Defendant, Harry Sargeant, III ("**HS3**"), by and through undersigned counsel and

pursuant to Federal Rules of Civil Procedure 8 and 12, hereby files this Answer, Affirmative

Defenses, and Counterclaim.

### PRELIMINARY STATEMENT[1]

    1.    Admitted that HS3 first brought claims against Daniel Hall ("**Hall**") on February

20, 2018, filing a Second Amended Complaint ("**SAC**") in *Sargeant v. Maroil Trading, Inc., et

al.,* Civ. No. 17-81070 (S.D. Fla.); that the SAC alleged violations of the Computer Fraud and

Abuse Act ("**CFAA**") and Florida law; and that the lawsuit was assigned to District Judge Beth

Bloom and Magistrate Judge Bruce Reinhart; otherwise denied.

---

[1] This Answer incorporates the section headings set forth in the Complaint only for purposes of
clarity and convenience. To the extent there are any implicit allegations in such headings, those
allegations are denied.  All allegations not expressly admitted herein are denied.

2.      Admitted that Judge Reinhart issued a Report and Recommendation ("**R&R**") on May 30, 2018 under Docket Entry 191 that recommended dismissal of the claims against Hall without prejudice and with leave to amend; otherwise denied.

3.      Admitted that Judge Reinhart issued a discovery order at Docket Entry 194; otherwise denied.

4.      Admitted that Federal Rule of Civil Procedure 72 allowed HS3 fourteen days to object to the R&R and that HS3 voluntarily dismissed his claims without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on June 4, 2018 under Docket Entry 196; otherwise denied.

5.      Admitted that a settlement agreement dated October 4, 2016, and releases effective October 28, 2016, were executed between HS3 and Mohammed Al-Saleh ("**Al-Saleh**"); otherwise denied.

6.      Admitted that Plaintiffs seek declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202; otherwise denied.

7.      Admitted that a settlement agreement dated October 4, 2016, and releases effective October 28, 2016 were executed between HS3 and Al-Saleh; otherwise denied.

**All allegations not expressly admitted herein are denied.**

**PARTIES, JURISDICTION, AND VENUE**

8.      Admitted.

9.      Without knowledge and therefore denied.

10.     Without knowledge and therefore denied.

11.     Admitted.

12.     Admitted that the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332, otherwise denied.

13.     Denied.

14.     Admitted that venue is proper pursuant to 28 U.S.C. § 1391.

15.     Admitted.

**All allegations not expressly admitted herein are denied.**


## STATEMENT OF FACTS

**A.  Mr. Al-Saleh's Litigation Against HS3**

16.     Admitted that Al-Saleh sued HS3 and others in Florida Circuit Court in and for Palm Beach County in or about 2008, otherwise denied.

17.     Without knowledge and therefore denied.

18.     Admitted that a jury verdict for $28.8 million was awarded July 27, 2011 in Al-Saleh's favor; that a Florida appellate court upheld the verdict upon a final opinion in August 2013; and that the Florida Supreme Court denied review.

19.     Denied.

20.     Without knowledge and therefore denied.

21.     Without knowledge and therefore denied.

**All allegations not expressly admitted herein are denied.**


**B.  The Settlement Agreement and Release**

22.     Admitted that a settlement agreement dated October 4, 2016, and releases effective October 28, 2016 were executed between HS3 and Al-Saleh; otherwise denied.

23.     Admitted that a settlement agreement dated October 4, 2016, and releases effective October 28, 2016 were executed between HS3 and Al-Saleh; otherwise denied.

24.     Admitted that the parties amended the original Settlement Agreement effective January 6, 2017; and that such amendment contained specific provisions; otherwise denied.

25.     Admitted that certain releases effective October 28, 2016, were provided on or about January 9, 2017; otherwise denied.

26.     Admitted that the Release was effective October 28, 2016, and contained specific provisions; otherwise denied.

27.     Denied.

28.     Denied.

29.     Without knowledge and therefore denied.

**All allegations not expressly admitted herein are denied.**


**C.  HS3 Breaches the Settlement Agreement and Release (Denied.)**

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Admitted that the SAC asserted claims against Hall for (1) conspiracy to violate the CFAA, 18 U.S.C. § 1030(a)(2)(C), and (2) civil conspiracy under Florida law to violate Florida's Computer Abuse and Data Recovery Act ("**CADRA**"), Fla. Stat. § 668.801 et seq., and to invade HS3's privacy; otherwise denied

36.    Admitted that Judge Reinhart issued an R&R on May 30, 2018, at Docket Entry 191, recommending that the claims against Hall be dismissed without prejudice; otherwise denied.

37.    Denied.

**All allegations not expressly admitted herein are denied.**


**D.  Mr. Hall Is Not Liable To HS3 (Denied.)**

38.    Denied.

39.    Denied.

40.    Denied.

41.    Denied.

42.    Denied.

**All allegations not expressly admitted herein are denied.**


E.    **HS3 Brought Baseless Claims Out of Malice Toward Mr. Hall and Burford Capital (Denied.)**

43.    Denied.

44.    Denied.

**All allegations not expressly admitted herein are denied.**


**COUNT I: DECLARATORY JUDGMENT (ON BEHALF OF ALL PLAINTIFFS)**

45.    HS3 re-asserts and incorporates herein by reference his responses to the preceding paragraphs.

46.   Admitted that HS3 voluntarily dismissed the SAC without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i); otherwise denied.

47.   Denied.

48.   Denied.

49.   Denied.

50.   Denied.

**All allegations not expressly admitted herein are denied.**


**COUNT II: BREACH OF CONTRACT (ON BEHALF OF ALL PLAINTIFFS)**

51.   HS3 re-asserts and incorporates herein by reference his responses to the preceding paragraphs.

52.   Denied.

53.   Denied.

54.   Denied.

55.   Denied.

56.   Denied.

57.   Denied.

58.   Denied.

**All allegations not expressly admitted herein are denied.**

## COUNT III: MALICIOUS PROSECUTION (ON BEHALF OF DANIEL HALL AND BURFORD CAPITAL)

59.     HS3 re-asserts and incorporates herein by reference his responses to the preceding paragraphs.

60.     Admitted.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

**All allegations not expressly admitted herein are denied.**


## PRAYER FOR RELIEF

To the extent there are any explicit or implicit allegations contained in the Prayer for Relief, those allegations are denied and Plaintiffs are not entitled to any relief or recovery.

**All allegations not expressly admitted herein are denied.**

## <u>AFFIRMATIVE DEFENSES</u>

I. **<u>Failure to State a Claim, Count II.</u>** The Complaint fails to state a claim upon which relief can be granted because there exists no claim for a breach of a release under Florida law based on the contractual language at issue.

II. **<u>Failure to State a Claim, Count III.</u>** The Complaint fails to state a claim upon which relief can be granted under Count III because Hall fails to satisfy the elements requisite to a malicious prosecution claim.

III. **<u>Novation.</u>** The disputed amount under the judgment and Settlement was discharged by the substitution of a new, valid obligation to promptly pay the outstanding balance by January 10, 2017, which obligation was fully satisfied.  The terms of that Amendment to Settlement Agreement (attached as an exhibit to the Complaint) establish (1) the parties intended to extinguish the initial obligations and (2) substitute the new obligations in full satisfaction.  As acknowledged in writing, HS3 complied fully with the terms of the Amendment to Settlement Agreement and no Actionable Events occurred.  Therefore, there is no agreement upon which to base any claim for recovery of purported liquidated damages, as all of HS3 obligations have been discharged.

IV. **<u>Payment.</u>**  Plaintiffs' Count II asserting a breach of contract action is barred by the doctrine of payment.  Before commencement of this action, *i.e.*, on or about January 10, 2017, HS3 discharged Plaintiffs' claim through payment of all amounts and obligations owed under the Settlement and Release and the Amendment to Settlement Agreement, nullifying any remaining monetary obligations, including any purported entitlement to $13.8 million in liquidated damages.

V.    **Accord & Satisfaction.** Plaintiffs' claim for the purported liquidated damages under the Settlement Agreement was the subject of a prior dispute between Al-Saleh and HS3, and on or about January 10, 2017, HS3 delivered to Plaintiffs via their agent, and Plaintiffs accepted from HS3, $11,910,000 in full satisfaction of Plaintiffs' claims related to the Al-Saleh judgments therefore nullifying any claim of entitlement to the liquidated damages portion of the Settlement Agreement referenced in the Complaint.

VI.   **Merger & Integration.** Plaintiffs advocate an interpretation of a contract (the Settlement) without any plain language in the contract on which to base their interpretation.  Thus, Plaintiffs apparently anticipate introducing evidence based on the parties' prior negotiations to divine an intent not expressed by the plain language of the agreement. That evidence is barred by the merger and integration clause at Section 27 of the Settlement Agreement.  Plaintiffs' claim relates to alleged pre-contractual representations or discussions which are inconsistent with the subsequent written agreements.

VII.  **Equitable Estoppel.** Plaintiffs are equitably estopped from pursuing recovery for any alleged breach of the Settlement and Release.  The documents attached to the Complaint establish that Plaintiffs agreed in January 2017 that the Settlement was fully performed, that no Actionable Events occurred and, accordingly, satisfactions of all judgments were recorded.  Plaintiffs' current suit seeking the approximately $13.8 million in liquidated damages in the Settlement is inconsistent with the Plaintiffs' prior position in January 2017 that the Settlement was fully performed.  HS3 relied on Plaintiffs' prior conduct in good faith in pursuing the SAC.

VIII.   **Unclean Hands.** Plaintiffs request equitable relief, including an injunction against HS3. Any party requesting equitable relief must do so with clean hands.  Plaintiffs instigated and participated in a scheme to acquire the HS3 Material after the Settlement was signed on October 4, 2016.  Plaintiffs' conduct in acquiring the HS3 Material was deceptive, unfair, and unscrupulous and is generally connected to the matter under dispute in Plaintiffs' Complaint.  Plaintiffs' wrongful conduct injured HS3 through, *inter alia*, embarrassment, and being forced to seek redress through the courts.

IX.   **Adverse Interest Exception.** The adverse interest exception bars Plaintiffs' claims that the Release is applicable to Hall's conduct.  Hall, a corporate agent of Burford, engaged in misconduct for his own benefit, *i.e.*, seeking, obtaining and disseminating the HS3 Material referenced in the SAC purely for his own benefit and prurient interests.  Hall also thereby acted contrary to his employers' interests by trading his employers' confidential client information to obtain the HS3 Material, conduct that harmed or could harm his employer.

X.   **Fraud in the Inducement.** The Plaintiffs participated in the negotiation of the Settlement documents and Releases attached to the Complaint.  But Plaintiffs failed to disclose that at that exact time, Hall was seeking and in fact obtained the HS3 Material through illicit means.  Indeed, Plaintiffs fraudulently misrepresented through their corporate agents, Aviva Will and others, that they were forbearing from judgment collection activities and seeking to resolve all outstanding issues.  Plaintiffs knew or should have known of the material omission that Hall was at that exact time seeking and obtaining the HS3 Material, and that HS3 had no reason or ability to know of the material omission or misrepresentation.  Plaintiffs intended HS3 to rely on the material omission and

misrepresentation in signing the Release and HS3 did in fact reasonably and justifiably rely on the material omission and misrepresentation.  Therefore, to the extent the Release could be construed to cover the conduct at issue in this action, that construction is void.

XI.   **Ripeness.** Plaintiff Hall's claim for malicious prosecution is not ripe because there has been no favorable termination of HS3's claims against Hall.

XII.   **Void as Against Public Policy.** To the extent the Release could be construed to apply to conduct alleged in this action, such construction is void under Florida law as against public policy.

## JURY TRIAL DEMANDED

Defendant, Harry Sargeant, III, hereby demands trial by jury of all issues so triable.

**WHEREFORE**, the Defendant, HS3, respectfully requests that the Court:

      A. Enter judgment in HS3's favor on Plaintiffs' claims;

      B. Award HS3 his reasonable costs and fees pursuant to the Settlement; and

      C. Grant HS3 such other and further relief as the Court deems just and proper.

## COUNTERCLAIM COMPLAINT

Defendant, Counterclaim Plaintiff, Harry Sargeant, III, ("**Counterclaim Plaintiff**" or "**HS3**") by and through his attorneys and pursuant to Federal Rule of Civil Procedure 13, hereby files this Counterclaim and sues Plaintiff, Counterclaim Defendant, Daniel Hall ("**Hall**"), and states as follows:

## PARTIES

1.      HS3 is a citizen and resident of Palm Beach County, Florida.

2.      Hall is a citizen and resident of the United Kingdom ("U.K.").

## JURISDICTION AND VENUE

3.      This Court has supplemental jurisdiction over this Counterclaim Complaint pursuant to 28 U.S.C. § 1367(a) because HS3's state-law claims are asserted under Florida law and comprise the same case and controversy as Hall's claims in the Complaint [ECF No. 1].

4.      This Court has personal jurisdiction over Counterclaim Defendant Hall because he is a plaintiff in the Complaint and submitted himself to the jurisdiction of this Court.

5.      Venue is proper in Palm Beach County, Florida because HS3 resides in Palm Beach County, Florida and because a substantial part of the acts, conduct, and omissions giving rise to the claims set forth in this Counterclaim Complaint occurred in Palm Beach County, Florida.

## FACTS

### I.      The HS3 Email Account.

6.      From approximately 1990 through 2012, HS3 had an ownership interest in and was involved with his brothers Daniel Sargeant and James Sargeant and their father Harry Sargeant, Jr. (collectively, the "**Sargeant Family**") in certain family business entities engaged in

the sale, transport, and distribution of asphalt and related petroleum products (the "**Sargeant Family Businesses**").

7.      At all times herein material, Sargeant Marine, Inc. ("**Sargeant Marine**"), a separate entity, owned a computer server (the "**Sargeant Server**") located within the jurisdiction of this Court at 3020 North Military Trail, #100, Boca Raton, Palm Beach County, Florida. The Sargeant Server, owned by Sargeant Marine, was utilized, *inter alia*, in connection with the operation of the other Sargeant Family Businesses.  At all times herein material, Daniel Sargeant was not an owner of or in Sargeant Marine or the Sargeant Server.

8.      At all times herein material, HS3 owned and utilized an email account on the Sargeant Server, denominated as hsargeantjr@sargeant.net (the "**HS3 Email Account**").

9.      HS3 used the HS3 Email Account for his work related to the Sargeant Family Businesses, for his personal emails, and for his personal business endeavors that were separate from the Sargeant Family Businesses.  The HS3 Email Account thus contained HS3's own business and confidential personal information.

10.     The HS3 Email Account was password protected.  HS3 did not provide the password to the HS3 Email Account to Hall, Daniel Sargeant, or the Sargeant Family.

11.     HS3 never explicitly or implicitly authorized Hall, Daniel Sargeant, or the Sargeant Family to access the HS3 Email Account or to access or obtain any information or material contained within the HS3 Email Account.

12.     The Sargeant Family Businesses were business entities separate from Sargeant Marine and had no authority to authorize access to the HS3 Email Account on the Sargeant Server.  The Sargeant Family Businesses had no official or unofficial, written or unwritten, policies or procedures authorizing Hall, Daniel Sargeant, or the Sargeant Family to access the

HS3 Email Account or to access or obtain any information or material contained within the HS3 Email Account.

13.     Sargeant Marine likewise had no official or unofficial, written or unwritten, policies or procedures authorizing Hall, Daniel Sargeant, or the Sargeant Family to access the HS3 Email Account or to access any information or material contained within the HS3 Email Account on the Sargeant Server. Thus, for example, even as co-owners of the other Sargeant Family Businesses, Daniel Sargeant would have no authorized access to the HS3 Email Account, and HS3 would have no authorized access to Daniel Sargeant's email account.

14.     HS3 owned and controlled access to the HS3 Email Account and only HS3 could authorize access to the HS3 Email Account.

15.     The only authorized access to the HS3 Email Account by someone other than HS3 was access by the system administrator granted only for legitimate, technical purposes, *e.g.*, maintenance, repairs, software patches, etc.  However, such access was granted only after confirming with the account owner (*i.e.*, HS3) that such access was authorized.  Moreover, any access to the Sargeant Server was granted by Sargeant Marine only for lawful purposes and not for purposes of any unlawful conduct.  Thus, the system administrator could not simply obtain and provide to others HS3's private information contained in the HS3 Email Account.

16.     At no time were Hall or Daniel Sargeant authorized to access the HS3 Email Account.

17.     In or about 2013, HS3 became embroiled in numerous disputes with his brothers Daniel Sargeant and James Sargeant, and his father Harry Sargeant, Jr., relative to the Sargeant Family Businesses. These disputes lead to contentious and hostile litigation in numerous forums throughout the world.

18.     As part of these disputes, HS3 was ousted involuntarily from the Sargeant Family Businesses, and denied access to the Sargeant Server and the HS3 Email Account.

19.     In or about February 2013, following his involuntary ouster, HS3 requested access to the HS3 Email Account and the information and data contained within the HS3 Email Account.  Sargeant Marine informed HS3 at that time that Sargeant Marine had ordered the disconnection of the HS3 Email Account, that all the associated information and data had been cut off from the root, and that no information or data from the HS3 Email Account could or would be provided to HS3.

20.     Based on this information from Sargeant Marine, HS3 concluded reasonably that the entirety of the HS3 Email Account and all associated information and data (including without limitation the HS3 Material) had been destroyed.

**II.     Daniel Hall.**

21.     Hall is affiliated currently with Plaintiff Burford.  Burford is a litigation finance company. Prior to his affiliation with Burford, Hall was a principal of Focus Intelligence, Ltd., ("**Focus**"), an asset-tracing and corporate investigations firm in the U.K.

22.     Hall became aware of HS3 through his work involving Mohammad Al-Saleh ("**Al-Saleh**"). Al-Saleh filed a complaint in the Fifteenth Judicial Circuit, Palm Beach County, Florida in 2008 against HS3 and others ("**Al-Saleh Claim**"). Al-Saleh ultimately obtained a $28.8 million judgment in 2011 against HS3 and the other defendants in that case, jointly and severally.

23.     In connection with the judgment enforcement process, Al-Saleh sought recovery from HS3 in multiple jurisdictions and courts.  Hall was involved extensively in these judgment enforcement efforts, often directing extreme and harassing tactics including stalking HS3's

associates on social media; stalking and harassing HS3 himself or with surveillance teams at various destinations around the world including Aspen, London, and Geneva; and profiling HS3's spending practices. Through these efforts, Hall became aware of the rift between HS3 and the Sargeant Family.

24.     Eventually, Hall, through his obsession with chasing HS3, and due to his own personal and prurient interests, set in motion the conduct and conspiracy at issue in this case.

### III.     LAIL, PDVSA, and Ruperti.

25.     One of the Sargeant Family Businesses, Latin American Investments, Ltd. ("**LAIL**"), was involved in several joint ventures relative to asphalt shipping contracts. Up until the time of his ouster, HS3, then a co-owner of LAIL, was the primary interlocutor between LAIL, its lenders, and its business partners, and was responsible for coordinating most commercial activities for LAIL.

26.     The LAIL joint ventures also involved association with an individual named Wilmer Ruperti ("**Ruperti**"), who assisted LAIL's efforts relating to business with Petroleos de Venezuela, S.A ("**PDVSA**"). When the business relationship between LAIL and PDVSA soured, disputes arose which led to the filing of claims in arbitration (the "**PDVSA Arbitration**").

27.     Daniel Sargeant arranged to have Ruperti act as lead negotiator in LAIL's attempts to settle the PDVSA Arbitration.  However, in or about late-2014 and early-2015, soon after appointing Ruperti as lead negotiator, Daniel Sargeant became concerned Ruperti may have misappropriated the PDVSA proceeds, forming the belief Ruperti had already settled with PDVSA without LAIL's knowledge. Thereafter, Daniel Sargeant began seeking information relative to Ruperti's activities from any and all sources, including Hall.

28.     In or about this same time period, Hall became familiar with Ruperti through his investigative work regarding a separate litigation between Ruperti and Novoship, later acquired by Sovcomflot. Sovcomflot was at the time a Burford client seeking to enforce a judgment against Ruperti.  As part of that investigation, Hall came into possession of numerous documents pertaining to Ruperti's finances, which were documents held in trust for Burford's client Novoship/Sovcomflot.  Some of these documents were also obtained through special procedures relating to a worldwide freezing order, which prohibited dissemination of the documents. Ruperti and his companies eventually, and finally, settled with Novoship/Sovcomflot in 2016. Novoship/Sovcomflot executed a nondisclosure agreement ("**NDA**") as part of that settlement that was structured, *inter alia*, to prevent disclosure of Ruperti's private business and financial information obtained by Novoship/Sovcomflot and Burford.  Hall would later breach this NDA and the client confidentiality owed to Novoship/Sovcomflot and abuse the worldwide freezing order under which the documents were obtained.

### IV.     Hall and Daniel Sargeant

29.     Hall first contacted Daniel Sargeant in or about November 2014.  At that time, Hall was seeking information concerning HS3 from Daniel Sargeant.

30.     Thereafter, on or about January 13, 2015, Hall met with Daniel Sargeant in London, spending almost a full day exploring the potential for mutually beneficial cooperation. At that meeting, Daniel Sargeant advised Hall the following: (1) that the HS3 Email Account still existed on the Sargeant Server; (2) that he had the ability to hack into the HS3 Email Account; (3) that the HS3 Email Account contained HS3's personal and business information; and (4) that HS3 would not know that his account had been hacked because HS3 did not think the account

existed as HS3 had been told after he was ousted from the Sargeant Family Businesses that the HS3 Email Account had been deleted and the contents destroyed.

31.     Also during that meeting, Hall first proposed to Daniel Sargeant the potential for mutually beneficial exchanges of information, informing Daniel Sargeant that he also was tracking Ruperti on behalf of a Burford client.

32.     Thereafter, on or about January 23, 2015, Daniel Sargeant obtained and provided information Hall sought from the HS3 Email Account that could be used to harass and embarrass HS3.  This information was provided to Daniel Sargeant's Florida lawyer, Charles Lichtman, who then provided it to Edward Davis, Al-Saleh's lawyer.  This information was then provided to Hall.  The information consisted of 78 pages of documents which included HS3's attorney-client communications, business information, personal information, and personal details of HS3's travel.  Hall received and reviewed this information.  Through his review and his personal discussions with Daniel Sargeant both before and after this exchange, Hall knew the information's nature and its source, namely, the HS3 Email Account.

33.     In or about April 2015, Daniel Sargeant learned from review of an affidavit filed in litigation related to the Novoship/Ruperti dispute that Hall had access to critical information regarding Ruperti, information useful and valuable to LAIL, including information concerning Ruperti's investments, bank accounts, and other financial information.

34.     Thereafter, and continuing into 2016, Hall gathered information regarding Ruperti through his work involving the Novoship/Sovcomflot matter.  During this same time period, Daniel Sargeant's concerns regarding Ruperti's misappropriation increased and the need for a solution became apparent.

35.     In or about August 2016, Hall contacted Daniel Sargeant to discuss an additional information exchange.  Hall sought and requested certain salacious and sensitive personal and business information regarding HS3 which, from his prior conversations with Daniel Sargeant, he understood would be in the HS3 Email Account (the "**HS3 Material**").  In return, Hall offered to effectively "pay" Daniel Sargeant for this information by providing in exchange information valuable to Daniel Sargeant regarding Ruperti from Burford's Novoship/Sovcomflot files (the "**Ruperti Material**").  Daniel Sargeant consulted with London counsel regarding the proposed information exchange to understand what information was needed to advance any potential claims against Ruperti.

36.     Thereafter, also in or about August 2016, Hall and Daniel Sargeant discussed accessing the HS3 Email Account, the HS3 Material and the Ruperti Material, and then utilizing same to advance their mutual personal and financial interests.

37.     The Ruperti Material was designed to aid Daniel Sargeant in pressing LAIL's claims against Ruperti.  The Ruperti Material consisted, *inter alia*, of Swiss bank statements, a letter of claim addressed to PDVSA, a settlement agreement with PDVSA, and a litigation work-product analysis of the above documents.

38.     Hall had access to the Ruperti Material because of his investigatory work for Burford in the Novoship/Sovcomflot case. However, the Ruperti Material was subject to the NDA from the Sovcomflot settlement, subject to the restrictions in the worldwide freezing order under which some of the information was obtained, as well as protected as confidential information of Burford's client Sovcomflot. Contrary to his duties and obligations to Burford, Hall ignored each of these obligations and accessed, copied, offered to trade, and ultimately did

trade the Ruperti Material for the purpose of obtaining the HS3 Material.  Hall's intentional

conduct was not undertaken in connection with the performance of any lawful duties to Burford.

39.     Daniel Sargeant again informed Hall at that time (1) that the HS3 Email Account

still existed on the Sargeant Server; (2) that he still had the ability to hack into the HS3 Email

Account; (3) that the HS3 Email Account contained the sensitive, private, personal and business

information of HS3 that Hall was seeking; and (4) that HS3 would not know that his account had

been hacked because HS3 did not think the account existed as HS3 had been told after he left the

Sargeant Family Businesses that the HS3 Email Account had been deleted and the contents

destroyed.

40.     The HS3 Material contained at least 478 separate business, personal, and

confidential items belonging to and relating to HS3, including business information, business and

personal communications, documents, Microsoft outlook email files, and personal, sensitive

photographs and videos. The personal information contained within the HS3 Material, which was

Hall's primary interest, included extremely sensitive videos and photographs of intimate activity

and private consensual relations involving HS3.

41.     The business information contained within the HS3 Material included details and

communications regarding HS3's private business ventures, which were unrelated to the

Sargeant Family Businesses. This business information included links to prototype operations of

a new steam generator system that one of HS3's businesses was developing, trade articles, and

updates on global business operations from employees of HS3's businesses.

42.     As set forth at paragraph 22 of Hall's complaint filed in this action, on October 4,

2016, HS3 and Al-Saleh entered into a comprehensive settlement agreement resolving all issues

and outstanding litigation.  Burford senior executives participated in the negotiation of that settlement.

43.     Nevertheless, despite the fact that then Burford client Al-Saleh had already settled his disputes with HS3, Hall and Daniel Sargeant met in London on October 6, 2016.  At this meeting, Hall provided certain preliminary information regarding Ruperti to Daniel Sargeant, and told Daniel Sargeant he would effectively "pay" for the HS3 Material by providing the Ruperti Material.

44.     On or about October 7, 2016, Daniel Sargeant, following additional consultation with his London counsel regarding the specific information needed relevant to a potential claim against Ruperti and his companies, contacted Hall.  Daniel Sargeant and Hall then planned and agreed to access the HS3 Email Account and obtain the HS3 Material, to access Burford's Novoship/Sovcomflot files and obtain the Ruperti Material, and then to exchange with each other this information to advance their mutual personal and financial interests.

45.     On or about October 28, 2016, 24 days after HS3 and Al-Saleh had executed their comprehensive settlement resolving all issues and outstanding litigation, Hall and Daniel Sargeant met again in London.  At this meeting, Hall provided to Daniel Sargeant the Ruperti Material, and Daniel Sargeant provided to Hall the HS3 Material.  Hall sought and obtained the HS3 Material at the exact time HS3, Burford and others were executing certain releases effective October 28, 2016.

46.     Following his receipt of the HS3 Material, on or about October 29, 2016 and continuing thereafter, Hall accessed and opened HS3's private emails.  Hall had no right to access and open these emails but did in fact possess, access, open, and view them without HS3's

explicit or implicit authorization.  At no time did HS3 authorize Hall to possess, access, open, or view his private emails or any information contained within the HS3 Material.

47.     Hall did not at any time inform HS3 that he had received, accessed, opened, and viewed HS3's private emails and did not return to HS3 any such private emails, notwithstanding demand for the return of the HS3 Material.  As of the date of this filing, Hall and/or his counsel are still in possession of the HS3 Material.

48.     Given the HS3/Al-Saleh settlement had been executed well prior to Hall obtaining, accessing and (later) disseminating the HS3 Material, Hall's intentional conduct was not undertaken in the performance of any duty to Burford, nor motivated by any purpose to serve anything other than his own interests.  Indeed, the intentional acquisition of HS3's salacious sex tapes could not possibly serve any legitimate purpose in the context of Burford's legitimate post-judgment collection efforts even before the HS3/Al-Saleh settlement, much less after.

49.     Hall's personal animus against, and motivation to harm, HS3 was later exemplified in an article published in the *Wall Street Journal* on November 7, 2017, entitled *Jet-Set Debt Collectors Join a Lucrative Game: Hunting the Superrich.*  Therein, despite the fact the Al-Saleh settlement had long since been consummated fully without incident or Actionable Event (as defined therein), Hall himself instigated publication of this article to further harass and embarrass HS3.  Publication of this article furthered Hall's own personal interests, as Burford no longer had any economic or legitimate interest in HS3.

50.     Thereafter, Daniel Sargeant and Hall communicated further regarding the Ruperti Material and its use to advance their financial interests.  In or about the week of October 31, 2016, Daniel Sargeant inquired as to whether some of the information in the Ruperti Material

was still current, specifically, whether the Ruperti accounts disclosed in the Ruperti Material still

had value, and Hall responded to that inquiry.

51.     Thereafter, and in connection with efforts to profit from the exchange of materials

herein described, Daniel Sargeant utilized the Ruperti Material to pursue claims against Ruperti's

companies in London, filing on or about March 1, 2017, a case styled *Latin American*

*Investments, Ltd. v. Maroil Trading, Inc. et al.*, Claim No. CL-2017-000130 in the High Court of

Justice, Queen's Bench Division, Commercial Court ("**London Litigation**").

52.     As acknowledged under oath by Daniel Sargeant's London counsel, the Ruperti

Material was essential to LAIL's prosecution of the London Litigation.  Daniel Sargeant and

Hall had thus arranged an exchange of information for their mutual benefit, serving their

financial and personal interests, and then utilized that information, *inter alia*, in the pursuit of

financial gain.

53.     Next, on or about May 5, 2017, Hall met in London with Daniel Sargeant to

discuss, *inter alia*, the progress of the London Litigation and Hall's share of any proceeds from

the London Litigation.  This meeting was preceded and followed up by several email

communications between Hall and Daniel Sargeant on at least May 4, 2017, May 8, 2017, May

10, 2017, May 11, 2017, May 26, 2017, July19, 2017, and July 26, 2017, all sent/received in

furtherance of their agreement as herein set forth.

54.     Throughout this same time period, and continuing into at least November 2017,

Daniel Sargeant and Hall continued to take actions that advanced the London Litigation in an

effort to profit from the information exchange.

55.     On or about November 17, 2017, a settlement was reached with Ruperti in the

London Litigation, resulting in a recovery of $30 million.  As of November 29, 2017, at least $8

million of the settlement proceeds were paid and distributed to or for the benefit of Daniel

Sargeant, Hall and others.

### V.    Dissemination and Publication of HS3's Private Emails.

56.    As detailed above, Daniel Sargeant and Hall disseminated and published the HS3

Material.

57.    Daniel Sargeant and Hall provided the HS3 Material to, *inter alia*, an untold

number of people (a) within the Sargeant Family Businesses; (b) employed at separate

corporations within the asphalt industry (*i.e.*, Gunvor Group, Vitol Group, *et al.*) all of whom

engaged in or transacted business with HS3; (c) within Burford and its affiliates; (d) former

counsel for Al-Saleh/Burford in the proceedings relative to the Al-Saleh Claim (who had ceased

representing Al-Saleh in 2014); and (e) to numerous other friends, associates and individuals

with interests adverse to HS3.

58.    As a direct and predictable result of the actions of Daniel Sargeant and/or Hall,

certain content of the HS3 Material has been disseminated to the public in general and/or a large

number of persons, *e.g.*, through the allegations in the publicly filed complaint in *Worldspan

Marine Inc. et al. v. Comerica Bank et al.*, No. 18-21924 (S.D. Fla.), at Docket Entry 1, ¶ 221,

which had not been made public before that time.


### COUNT I — INVASION OF PRIVACY (INTRUSION)

59.    Counterclaim Plaintiff, Harry Sargeant, III, incorporates and realleges paragraphs

1 through 58 above as if herein fully set forth.

60.    Daniel Sargeant and Hall intruded on the HS3 Email Account and obtained the

HS3 Material, which included extremely private and sensitive photos and videos of intimate

activity involving HS3.

61.     HS3 possessed a reasonable expectation of privacy in the HS3 Material and the HS3 Email Account.

62.     The HS3 Material is not of a legitimate public interest.

63.     Hall's actions in obtaining the HS3 Material, knowing that such information was extremely sensitive and personal when he sought it, and then disclosing that information to others and further causing the content to be disclosed publicly for profit and to embarrass HS3 is conduct that is highly offensive to a reasonable person and unacceptable in a civilized community.

64.     HS3 has been damaged by the intrusion into his private emails, including, but not limited to, lost profits, economic damages, emotional distress, mental anguish, and the profits from the recovery in the London Litigation.

65.     The invasion of privacy by intrusion is an intentional tort, for which HS3 is entitled to punitive damages.

## COUNT II — INVASION OF PRIVACY (PUBLICATION)

66.     Counterclaim Plaintiff, Harry Sargeant, III, incorporates and realleges paragraphs 1 through 58 above as if herein fully set forth.

67.     Daniel Sargeant and Hall intruded on the HS3 Email Account and obtained the HS3 Material, which included extremely private and sensitive photos and videos of intimate activity involving HS3.

68.     HS3 possessed a reasonable expectation of privacy in the HS3 Material and the HS3 Email Account.

69.     The HS3 Material is not of a legitimate public interest.

70.     Hall disseminated and published the HS3 Material.

71.     Hall, in concert with Daniel Sargeant, provided the HS3 Material to, *inter alia*, an untold number of people (a) within the Sargeant Family Businesses; (b) employed at separate corporations within the asphalt industry (*i.e.*, Gunvor Group, Vitol Group, *et al.*) all of whom engaged in or transacted business with HS3; (c) within Burford and its affiliates; (d) former counsel for Al-Saleh/Burford in the proceedings relative to the Al-Saleh Claim (who had ceased representing Al-Saleh in 2014); and (e) to numerous other friends, associates and individuals with interests adverse to HS3.

72.     As a direct and predictable result of the actions of Daniel Sargeant and Hall, certain content of the HS3 Material has been disseminated to the public in general and/or a large number of persons, including, but not limited to, through the allegations in the publicly filed complaint in *Worldspan Marine Inc. et al. v. Comerica Bank et al.*, No. 18-21924 (S.D. Fla.), at Docket Entry 1, ¶ 221, which had not been made public before that time.

73.     Hall's actions in obtaining the HS3 Material, knowing that such information was extremely sensitive and personal when he sought it, and then disclosing that information to others and causing the content to be disclosed publicly for profit and to embarrass HS3 is conduct that is highly offensive to a reasonable person and unacceptable in a civilized community.

74.     HS3 has been damaged by the publication of his private emails, including, but not limited to, lost profits, economic damages, emotional distress, mental anguish, and the profits from the recovery in the London Litigation.

75.     The invasion of privacy by publication is an intentional tort, for which HS3 is entitled to punitive damages.

## COUNT III — CIVIL CONSPIRACY

76.     Counterclaim Plaintiff, Harry Sargeant, III, incorporates and realleges paragraphs 1 through 75 above as if herein fully set forth.

77.     Commencing on or about October 7, 2016 and continuing up to and including at least July 2017, Hall participated in a conspiracy with Daniel Sargeant and others to harass and embarrass HS3, and to profit from an illicit exchange of information concerning HS3 and Ruperti.  Hall proposed and agreed to a scheme whereby he and Daniel Sargeant would, unlawfully and without authorization, access the HS3 Email Account to obtain the HS3 Material, disseminate that information to embarrass and harass HS3, and to profit from the exchange of the HS3 Material for certain other illicit material.  The ultimate goals of the conspiracy were to harass and embarrass HS3, and to profit from the use of the exchange of information.

78.     From on or about October 7, 2016 up to and continuing up to and including at least July 2017, and potentially well thereafter, Hall conspired with Daniel Sargeant and others and agreed to act, and in fact did act to invade HS3's privacy by unlawfully obtaining, accessing, viewing, using, disseminating and publishing the HS3 Material.

79.     The objects of the conspiracy were to profit from the use of the Ruperti Material and to embarrass and harass HS3 through obtaining, accessing, viewing, using, disseminating, and publishing the HS3 Material.

80.     Hall knowingly participated in the conspiracy to invade HS3's privacy, including by knowing the provenance and content of the HS3 Material and Ruperti Material.

81.     Each of the co-conspirators took at least one act in furtherance of the conspiracy by accessing, viewing, obtaining, using, disseminating and/or publishing the HS3 Material to embarrass and harass HS3 and/or seeking to profit from the Ruperti Material by pressing LAIL's

claims in the London Litigation and/or negotiating to profit from LAIL's claims in the London Litigation.

82.     Hall also engaged in the numerous personal and electronic communications and the in person meetings detailed herein in furtherance of the conspiracy.

83.     The conspiracy was/is not complete until the final act of publication or dissemination of the HS3 Material and the final payment from Ruperti to end the London Litigation.

84.     HS3 was damaged by the conspiracy through including, but not limited to, lost profits, economic damages, emotional distress, mental anguish, and the profits from the recovery in the London Litigation.

85.     The civil conspiracy is an intentional tort, for which HS3 is entitled to punitive damages.

## COUNT IV — UNJUST ENRICHMENT

86.     Counterclaim Plaintiff, Harry Sargeant, III, incorporates and realleges paragraphs 1 through 85 above as if herein fully set forth.

87.     Hall received something of value from HS3, *i.e.*, the HS3 Material.

88.     Hall voluntarily accepted, retained, and took the benefits conferred from the HS3 Material and is enjoying said benefits at HS3's expense.

89.     The circumstances are such that it would be inequitable for Hall to retain the benefits without paying the value thereof to HS3.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiff, Harry Sargeant, III, demands judgment against

the Counterclaim Defendant Hall for the following:

a.      damages, including actual damages, in an amount to be determined at trial;

b.      punitive damages;

c.      injunctive relief against the Hall and others he disseminated the HS3 Material to, to

prevent a future publication and dissemination of the HS3 Material pursuant to general principles

of equity;

d.      return of all misappropriated information and copies thereof pursuant to general

principles of equity;

e.      costs; and

f.      prejudgment interest.

## <u>JURY TRIAL DEMANDED</u>

Counterclaim Plaintiff, Harry Sargeant, III, hereby demands trial by jury of all issues so triable.


Respectfully submitted this 3rd day of December, 2018.

By: */s/   Christopher M. Kise*
Christopher M. Kise
FL Bar No. 855545
ckise@foley.com
Melissa B. Coffey
FL Bar No. 84090
mcoffey@foley.com
Joshua M. Hawkes
FL Bar No. 112539
jhawkes@foley.com
**FOLEY & LARDNER LLP**
106 East College Avenue, Suite 900
Tallahassee, FL 32301-7732
Telephone: (850) 222-6100
Facsimile: (850) 561-6475

Gregory W. Coleman
FL Bar No. 846831
gcoleman@lawclc.com
Santo DiGangi
FL Bar No. 71682
sdigangi@lawclc.com
**CRITTON, LUTTIER & COLEMAN, LLP**
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
Telephone: (561) 842-2820
Facsimile: (561) 844-6929

*Attorneys for Defendant and Counterclaim*
*Plaintiff, HARRY SARGEANT, III*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF on December 3, 2018 on all counsel or parties of record in the below service list.

## <u>SERVICE LIST</u>

Derek T. Ho
dho@kellogghansen.com
Andrew E. Goldsmith
agoldsmith@kellogghansen.com
David Suska
dsuska@kellogghansen.com
**KELLOGG, HANSEN, ET AL., P.L.L.C**
1615 M Street, N.W., Suite 400
Washington, DC 20036

Samuel A. Danon
sdanon@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2510
Facsimile: (305) 810-2460
*Attorneys for Plaintiffs and Counterclaim Defendant Hall*

By: */s/  Joshua M. Hawkes*
        Joshua M. Hawkes